IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2003 Session

## STATE OF TENNESSEE v. CHRISTOPHER LOVIN

**Appeal from the Circuit Court for Claiborne County**
**No. 11,687     E. Shayne Sexton, Judge**

---

**No. E2002-01231-CCA-R3-CD**
**October 31, 2003**

---

The defendant, Christopher Lovin, was convicted of felony murder in the perpetration of aggravated child abuse. In this appeal of right, the defendant argues that the evidence was insufficient and submits that the trial court erred by failing to exclude cumulative medical testimony. The judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Julie A. Rice (on appeal); and Charles Herman and Dan Korth, Assistant Public Defenders (at trial), for the appellant, Christopher Lovin.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; and Jared Effler, John W. Galloway, Jr., and Todd Longmire, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

At 1:12 A.M. on October 16, 2000, Cindy Gerralls and Rita Hurst, emergency medical technicians with the Claiborne County Ambulance Service, were dispatched to a Tazewell residence occupied by the defendant, Christopher Lovin, and his fiancé, Bonnie Raske. Ms. Raske, the mother of the victim, four-month-old Caylis Lovin, was outside directing the emergency unit to the proper location. Within four minutes of the dispatch, Ms. Gerralls and Ms. Hurst arrived, finding the defendant, the father of the victim, inside the residence kneeling over his son. The defendant had his left arm under a pillow and his right hand on the victim's abdomen. As Ms. Gerralls entered the room, the defendant remarked, "I can't do anything more, I've been doing this for 30 or 45 minutes." Because the victim was born three months prematurely and had been cared for in the neonatal intensive care unit at the University of Tennessee Medical Center, he was connected to an apnea monitor at the time the emergency personnel arrived. Ms. Gerralls determined that the victim had

no pulse, was "very, very cold and blue and was not breathing." There was no sound of alarm from the monitor during the period the emergency technicians were at the residence. Ms. Gerralls and Ms. Hurst transported the victim by ambulance to the Claiborne County Hospital emergency room, arriving precisely 15 minutes after the original dispatch. The medical staff was able to generate a heart rate but was unable to establish spontaneous respiration. After approximately one hour at the emergency room, the victim was transported to East Tennessee Children's Hospital in Knoxville.

Dr. Joseph Child, a pediatric intensivist, and one of his associates, Dr. Jeff Queen, treated the victim upon his arrival at Children's Hospital. Dr. Child determined that the victim had an extreme buildup of acid in the bloodstream which was the result of either a prolonged period of oxygen deprivation or very low blood pressure. With the assistance of other specialists, Dr. Child was able to determine that there was blood around the surface of the brain and between the hemispheres. The brain was swollen and a CAT Scan indicated that there was no blood flow. Dr. Child described the victim as "cold" and "gray." The victim's kidneys were failing and the retinas of each eye were covered with blood. Treatment was unsuccessful and death resulted from oxygen deprivation.

Bobby Morelock, a detective with the Claiborne County Sheriff's Department, questioned the defendant while the victim was still alive. The defendant made the following statement:

He was pale all day and coughing and turning colors. Mom got him out of his swing once to check on him. Everything was pretty normal seemed like. He was still pale, gurgling a little but he was breathing. I told Bonnie he was sick, he was just kind of lifeless throughout yesterday and last night. Caylis was asleep when Bonnie went to bed around 12:00. Bonnie fed Caylis before she went to bed. Caylis was crying around 12:30 A.M. and Bonnie asked what he was crying for. I was trying to hook up the heart monitor on him. I fed him before I tried to hook up the heart monitor but I never got the monitor hooked up. I got his breathing treatments ready but Bonnie already had everything ready in the treatment. Caylis was on the couch and asleep so I got the breathing tube and put it close to Caylis's nose so I wouldn't wake him back up. When I got the treatment started and put the hose up to his nose, I held it there until it was done, about five minutes. I then put up . . . the breathing treatment. I then went to get his stuff to change his diaper and wipe him off. When I got his clothes off, I noticed he wasn't breathing. One of the reasons I took his clothes off was to hook his monitor back up. I didn't see any response to him. I picked him [up] and didn't feel nothing. I had my left hand on the back of his head, holding it up and just kind of shook it, saying, Caylis, Caylis, hoping he would shake out of it. I leaned down and gave him a puff of air and looked over at the monitor and it was showing nothing. I laid him back down on the couch and began CPR. I was trying for around five minutes. I was just trying to get him back. I kept screaming for Bonnie for a while. [I ] never moved him from the couch. I kept giving him puffs and pushing on his chest sometimes. I had to push a little harder

-2-

because he never would do nothing. Bonnie got up and panicked and I was cussing at Bonnie because she just kept running through the house there and I said go – go call an ambulance, he's not breathing. She left to call and I just kept trying to get him breathing. Every time I quit, the monitor would quit. The ambulance people got there and didn't bring nothing inside with them. They just picked him up and carried him to the ambulance when they came in. I just unhooked the plugs from the monitor.

On the day following his initial statement, the defendant was questioned by TBI Agent Steve Vinsant and Detective Morelock. By the time of this interview, the victim had died. Each of the officers recalled that the defendant had acknowledged that he was alone with the victim at the time the victim stopped breathing. They also remembered that the defendant never made mention of either shaking, striking, or dropping the victim. The defendant was arrested for murder on October 19, three days after the initial hospitalization.

Agent Vinsant recalled that during questioning, the defendant suggested that the emergency personnel may have injured the victim by jumping off the porch without properly supporting the head. Agent Vinsant recalled that the defendant had speculated that the rib fractures may have been due to his efforts at CPR. According to the officer, the defendant had stated that Ms. Raske had been in bed for over an hour before he called for medical assistance.

Dr. Child described infants generally as having large, heavy heads as compared to the rest of the body and having weak neck muscles, thereby making them particularly susceptible to a brain injury due to shaking. It was his opinion that the death of the victim, which occurred within hours after he was transported to Children's Hospital, was due to Shaken Infant Syndrome, which involves a tearing of the blood vessels that support the brain. Dr. Child described the force required to cause the injuries to the victim as "severe" and "violent" in which "the head is just cracking like a whip at the neck." He also found internal bleeding into the abdomen as a contributing cause of death. The spleen was fractured, the liver was torn in three places, and the left kidney and adrenal gland were bruised and damaged, injuries which, in Dr. Child's opinion, "would have eventually led to this baby's death . . . ." It was his assessment that the injuries to the internal organs were the result of "blunt force," which had been "directly applied," a force different from that causing the damage to the head.

Dr. Sandra Elkins, the Director of Autopsy Services and Forensic Pathology at the University of Tennessee Medical Center, and who also serves as Medical Examiner for Knox County, performed the autopsy. She also identified two separate areas of critical injury, either of which would cause death: head trauma qualifying as Shaken Infant Syndrome and blunt force injuries to the chest and abdomen. Dr. Elkins' findings included subdural hematoma or blood clotting on the surface of the brain, retinal hemorrhaging, rib fractures due to a compressing force, pulmonary contusions to the lungs, and severe internal bleeding due to lacerations of the liver and the spleen.

Dr. Elkins described these injuries as very uncommon in infants and, in her opinion, far too severe to result from a fall to the floor or any attempt at cardiopulmonary resuscitation. Dr. Murray Kevin Marks, a forensic anthropologist, assisted in the autopsy. He described a variety of rib fractures ranging from "creases" to "complete breaks." It was his opinion that the fractures were due to significant external pressure on the right front of the chest.

Ronald Ford, a pediatrician at Children's Hospital, described the victim as comatose but still alive upon his admission to the intensive care unit. Due to the signs of brain trauma and the resulting brain swelling, it was Dr. Ford's opinion that the victim had died of "very violent shaking." It was Dr. Ford's further assessment that because of the extensive nature of the injury, the victim's brain was no longer able to send signals to the other organs to maintain their function.

Bonnie Raske, the 18-year-old mother of the victim, testified as a defense witness. She stated that the premature birth of the victim had caused breathing difficulties to such an extent that he required an apnea monitor. Ms. Raske confirmed that while the victim was born on June 11, he was not released from the hospital until September 2 and had been in her home for less than a month and a half at the time of his death. She described the victim as "always coughing, throwing up, he wouldn't hold his formula down." According to Ms. Raske, the victim was re-hospitalized, treated for pneumonia, and released about one week prior to his death. Seven months pregnant with a second child by the time of trial, Ms. Raske described the defendant as a loving father. She claimed that only hours prior to the episode that led to his death, the victim had stopped breathing and that she had revived him by shaking him and breathing into his mouth. Ms. Raske stated that the victim "constantly quit breathing" as indicated by his apnea monitor alarm. On the evening of the victim's last hospitalization, Ms. Raske and the defendant had bought wine and had drinks. According to Ms. Raske, she became intoxicated, went to bed, and asked the defendant to take care of the victim. She recalled being awakened when the defendant began to scream that the victim was not breathing. At the defendant's direction, Ms. Raske called 911 while the defendant administered CPR, using "both hands."

The defendant, testifying at trial in his own behalf, contended that he had planned a romantic evening with his fiancé and that after dinner, their lovemaking was interrupted when Ms. Raske became ill from too much wine. The defendant claimed that he later gave the victim his medication and prepared him for bed. The defendant stated that the apnea monitor alarm sounded as the victim stopped breathing. While acknowledging that he had shaken the victim's leg, the defendant claimed that he had done so gently in an effort to revive the victim and then breathed air into his mouth. The defendant testified that he began CPR by using an index finger on the chest and that when there was no response, he screamed for help from Ms. Raske, who was too dazed to assist. The defendant stated that he then made contact with the victim's upper stomach in an effort to perform CPR and increased pressure to the area just above the navel. He described the pressure he applied with his hands as "more than I was realizing at the time." The defendant stated that he believed the victim was either dying or dead by the time the ambulance arrived. He described himself as in shock and acknowledged that he had squeezed the victim "so hard . . . my arms were shaking" as he attempted

resuscitation. The defendant also admitted shaking the victim but was unable to say how hard. It was his contention that the medication had caused the victim to stop breathing.

I

In this appeal, the defendant first argues that the state failed to prove that he had any awareness of being abusive when the fatal injuries were inflicted. It is his claim that the injuries occurred as the defendant increased his level of force in the administration of CPR. He argues that the injuries to the brain were the result of his attempts to remove the medication be believed had initially caused the victim to stop breathing. The defendant submits that it is "entirely logical and reasonable" that the injuries were accidental.

On appeal and after a guilty verdict, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

A criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958); State v. Hailey, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In such an event, the circumstantial evidence must be both consistent with guilt and inconsistent with innocence. Pruitt v. State, 460 S.W.2d 385, 3990 (Tenn. Crim. App. 1970). The weight of the circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974) (citing Patterson v. State, 4 Tenn. Crim. App. 657, 475 S.W.2d 201 (1971)). The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas, 286 S.W.2d at 859; Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). The same standard of review is applicable whether the guilty verdict was based upon direct evidence or upon circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (1971).

All of the medical evidence established that the victim died from head injuries resulting from a violent shaking and from internal bleeding due to blunt force trauma to the torso. The defendant

acknowledged that only he was in a position to inflict injuries of that nature unless, of course, his speculation about the medical technicians' possible mishandling of the victim had been supported by the evidence offered at trial. While the defense presented a plausible theory that the defendant had panicked in an emergency situation and unintentionally caused the death of a particularly vulnerable infant, it was the prerogative of the jury to determine whether the proof offered by the state excluded every reasonable hypothesis except for guilt as charged. See State v. Benjamin Brown, No. W1999-00327-CCA-R3-CD (Tenn. Crim. App., at Jackson, Oct. 24, 2000).

That the jury rejected the defendant's claim that he had only gently shaken the leg of the victim is not surprising. He had made no mention of having shaken the victim in his statement to the police and each of three physicians determined that the severity of the injuries belied his explanation.

In its review of the evidence, an appellate court must afford the state the "strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The court may not "reweigh or reevaluate the evidence" in the record below. Evans, 838 S.W. 2d at 191; see also State v. Mann, 959 S.W.2d 503, 518 (Tenn. 1997) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or the trial court judgment. Tuggle, 639 S.W.2d at 914. By the use of these guidelines, the evidence is sufficient to support the conviction.

II

Next, the defendant argues that the trial court committed reversible error by failing to exclude cumulative expert testimony relating to the cause of death. The defendant submits that it was prejudicial for the trial court to permit three medical experts to testify to the nature of the injuries suffered by the victim and the possible causes of death. It is the defendant's contention that the testimony of two of the three physicians should have been excluded.

In Conlee v. Taylor, 153 Tenn. 507, 285 S.W. 35, 36 (1926), our supreme court considered "whether or not the trial judge should limit the number of witnesses a party may deem necessary to introduce in order to make out his case on the main issue involved." Our high court noted that "[t]he question has been much discussed by the text-writers . . . " and approved of the following language:

In 26 R.C.L., section 37, p. 1033, it is said:

"So long as facts testified to by a party are not conclusively established, or admitted, they are open to further proof, and it is error to exclude evidence on the ground that it is cumulative. Where evidence is excluded on this ground, the court should not submit the issue of fact to the jury. It may be said to be a general rule that the trial court may, in its discretion, limit the number of witnesses who may be called to prove a particular link in the chain of evidence, and this is especially true as to

-6-

expert witnesses, or impeaching witnesses, except where character is the main fact in issue.  It would seem, however, that the number should not be limited as to the *main fact in issue*, where the witnesses are not experts, as in certain cases stated."

Id. (alteration in original).

Dean Wigmore, in an early work, described the duty of the trial judge in drawing a line of balance: "the effort has been to draw the line fairly between necessary and unnecessary complication." 3 Wigmore, Evidence § 1907.  In White v. Vanderbilt University, our court of appeals determined that each issue "must be decided on its own facts . . . and the trial court must be careful not to usurp the function of the jury in the process . . . ." 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999). "A trial court should not exclude evidence under Tenn. R. Evid. 403 when the balance between the probative worth of the evidence and the countervailing factors is fairly debatable."  Id.  In great measure, the trial court is vested with a sound discretion in regard to limiting the number of witnesses.  See Shields v. State, 197 Tenn. 83, 270 S.W.2d 367, 371 (1954).

In the circumstances of this case, it is our view that the use of three physicians to testify to the extent of the victim's injuries and the cause of his death did not unfairly prejudice the defendant. Cause of death was the central issue.  Certainly the trial court did not abuse its discretionary authority.  Initially, two of the three medical experts utilized by the state had treated the victim.  Dr. Child and Dr. Ford were at Children's Hospital and, in conjunction with other physicians who were not called as witnesses, made specific medical findings in an effort to save the life of the victim. Because the victim, due to a premature birth, required a sleep apnea monitor and because the defendant claimed that some of the injuries were the result of his attempts at resuscitation, a second opinion had significant probative value.  Moreover, because the convicting evidence was entirely circumstantial, the state had the burden of excluding every reasonable hypothesis other than the defendant's guilt of the crime charged.  The testimony of the pathologist was equally essential as to the cause of the victims death.  Confirmation of a substantial hematoma, retinal hemorrhaging, rib fractures, and lacerations to the internal organs tended to refute beyond any reasonable doubt the defendant's claims of innocence.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-7-